UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARNEY HOSPITAL<br>TRANSITIONAL CARE UNIT<br>2100 Dorchester Avenue<br>Boston, MA 02124,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL O. LEAVITT, SECRETARY<br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20001,<br><br>Defendant. | Civil Action No. _____ |

## COMPLAINT FOR JUDICIAL REVIEW
## OF FINAL ADVERSE AGENCY ACTION

The plaintiff, Carney Hospital Transitional Care Unit ("Carney TCU"), seeks judicial

review of a decision by the Secretary of Health and Human Services, upon remand from this

Court, denying Carney TCU's request for a "new provider exemption" from the Medicare

reimbursement cost limits applicable to it. The subject remand, in turn, was from a

Complaint filed by Carney TCU with this Court following a decision by the Provider

Reimbursement Review Board ("the Board") upholding the denial by the Centers for

Medicare and Medicaid ("CMS") (formerly the Health Care Financing Administration) of

Carney TCU's request for a "new provider exemption". The Board had conducted a two day

full evidentiary hearing on February 7 and 8, 2002 at which CMS had an unfettered

opportunity to establish that Carney TCU's transferor organization had been "primarily"

engaged in delivering skilled nursing services and other evidence in support of its denial of a

"new provider exemption." CMS had failed to present such evidence. A majority of the Board (the Chairman dissenting) nevertheless had upheld CMS' denial of the new provider exemption after the two-day evidentiary hearing.

Carney TCU brings this action because the Secretary's decision directly violated the Order of this Court remanding the matter to him for a narrow and specific purpose: to review the record before the Board in light of a decision by the United States Court of Appeals for the District of Columbia Circuit, *St. Elizabeth's Medical Center of Boston, Inc.* v. *Thompson*, 395 F.3 1228 (D.C. Cir. 2005). In its September 14, 2004 Complaint to this Court, Carney TCU asserted that the Board's decision was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and unsupported by substantial evidence. Carney TCU sought therein, and now seeks an order reversing the Board's decision and directing CMS to treat Carney TCU as a new provider for purposes of calculating the Medicare reimbursement that was due to Carney TCU (through payment to Carney Hospital) for its Medicare cost reporting periods ending September 30, 1996, September 30, 1997, and September 30, 1998.

## PARTIES

1.      Carney TCU is a 27-bed skilled nursing facility located within and on the campus of Carney Hospital, a Massachusetts corporation with its principal place of business at 2100 Dorchester Avenue, Boston, Massachusetts.

2.      Defendant Michael O. Leavitt ("the Secretary") is the Secretary of the United States Department of Health and Human Services ("HHS"), and in that capacity is responsible for HHS functions, including the operation of the medical insurance program established by Congress in Title XVIII of the Social Security Act, as amended, 42 U.S.C.

§§ 1395, *et seq.* (the "Medicare Program"). The Secretary has delegated responsibility for the administration of the Medicare Program to CMS and its Administrator.

### JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 42 U.S.C. § 139500(f) and 28 U.S.C. § 1331.

4.    Venue lies in this district pursuant to 42 U.S.C. § 1395oo(f)(1).

### BACKGROUND

### The Federal Regulatory Scheme

5.    Congress established the Medicare Program to ensure that the aged and disabled would have access to health care services. See 42 U.S.C. §§ 1395, *et seq.* Under the Medicare Program, CMS, acting on the authority of the Secretary, reimburses qualifying health care providers for reasonable costs they incur in treating Medicare patients. 42 U.S.C. §§ 1395cc, 1395g, 1395x(v)(1)(A).

6.    Skilled nursing facilities ("SNFs") are one "type of provider" that qualifies for reimbursement under the Medicare Program. Congress has defined a "skilled nursing facility" to be an institution, or a distinct part of an institution, that is:

primarily engaged in providing to residents--

(A)    skilled nursing care and related services for residents who require medical or nursing care, or

(B)    rehabilitation services for the rehabilitation of injured, disabled, or sick persons... 42 U.S.C. § 1395i-3(a)(1) (emphasis added). In contrast, nursing facilities ("NFs") may offer services similar to those offered by SNFs but may also be "primarily engaged in providing" only so-called "custodial care," and in that event NFs do not qualify

for reimbursement under the Medicare Program. NFs are instead reimbursed under the Medicaid program, which is also administered by CMS. See 42 U.S.C. § 1396, *et seq.*

7.      "Fiscal intermediaries" (typically private insurance companies) serve as claims managers for the Medicare Program at the local level pursuant to contracts between the fiscal intermediaries and CMS. 42 U.S.C. § 1395h.

8.      Section 1861(v)(1)(A) of the Social Security Act, 42 U.S.C. § 1395x(v)(1)(A), authorizes the Secretary to establish limits, known as "routine cost limits," on the operating costs that may be reimbursed to providers such as skilled nursing facilities. The Secretary has delegated this authority to CMS. 42 C.F.R. § 413.30. Routine cost limits are determined on a per patient day basis (e.g., each day of a SNF patient's stay is considered one "patient day").

9.      Medicare regulations permit various forms of adjustment to the routine cost limits. Under the regulations in place at the times relevant to this case, a SNF that met certain criteria was deemed a "new provider" and thus was eligible for an exemption from the routine cost limits. 42 C.F.R. § 413.30(e) (1997).[1]

10.      Section 413.30(e) defined a "new provider" as "a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years." Id. A new provider exemption entitles a skilled nursing facility to reimbursement from Medicare for all of its reasonable nursing service costs without the cap imposed by routine cost limits, and an exemption "expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts its first patient." Id.

---

[1] The new provider exemption regulation now appears at 42 C.F.R. § 413.30(d).

11.    CMS publishes a <u>Provider Reimbursement Manual,</u> CMS Pub. 15 (the

"Manual"), which contains guidelines interpreting the Medicare regulations; these are used,

*inter alia,* by fiscal intermediaries when making reimbursement determinations. Although

fiscal intermediaries make most of the determinations regarding what reimbursement is due

to a provider, the decision regarding whether to grant a provider -- e.g., a skilled nursing

facility -- an exemption from the routine cost limits which otherwise apply to its Medicare

reimbursement is made by CMS.

12.    Section 2604.1 of the Manual, which discussed the new provider exemption and

was in effect during the period pertinent to this case, states, in pertinent part:

> A new provider is an institution that has operated in the manner for which it
> is certified in the program (or the equivalent thereof) under present and
> previous ownership for less than three full years. For example, an institution
> that has been furnishing only custodial care to patients for two full years prior
> to its becoming certified as a hospital furnishing covered services to
> Medicare beneficiaries, shall be considered a "new provider" for three full
> years from the effective date of its [Medicare] certification. However, if an
> institution has been furnishing hospital health care for two full years prior to
> its certification, it shall only be considered a "new provider" in its third full
> year of operation, which is its first full year of participation in the [Medicare]
> program.
>     . . .
>
> [A] provider which relocates may be granted new provider status where the
> normal inpatient population can no longer be expected to be served at the new
> location. The distance moved from the old location will be considered but
> will not be the determining factor in granting new provider status. For
> example, a specialty hospital may move a considerable distance and still care
> for generally the same inpatient population, while the relocation of a general
> hospital a relatively short distance within a metropolitan area may greatly
> affect the inpatient population. A provider seeking such new provider status
> must apply to the intermediary and demonstrate that in the new location a
> substantially different inpatient population is being served. In addition, the
> provider must demonstrate that the total inpatient days at the new location
> were substantially less than at the old location for a comparable period during
> the year prior to the relocation. The periods compared must be at least three
> months in duration.

### The State Regulatory Scheme and Policies Sought To Be Achieved

13.     In Massachusetts (as in most jurisdictions), "long term care" refers to all types of inpatient or resident care less intensive than acute, hospital care.  Massachusetts recognizes and licenses four levels of long term care facilities: Level I (intensive nursing and rehabilitative care); Level II (skilled nursing care); Level III (supportive nursing care); and Level IV (resident care).  Mass. Regs. Code tit. 105, § 151.020.

14.     Level II skilled nursing care is designed for patients who have just been discharged from a hospital and need full time (24 hour/7 day) nursing and rehabilitation care in an institutional setting (e.g., people recovering from strokes, hip fractures, and major surgery).  Patients usually tend to stay at Level II facilities for short periods of time -- e.g., *two* weeks --and are then either discharged to their homes, or to nursing facilities that provide less intensive, supportive or custodial care on a long-term basis -- e.g., Level III facilities.  It is not uncommon for patients -- or residents -- to stay in Level III facilities for years.

15.     Many Massachusetts Level III facilities are located in older, wood-frame buildings that lack elevators, corridors wide enough to accommodate wheelchairs, or fully handicapped-accessible bathrooms, and the bedrooms in Level III facilities are typically cramped and crowded. Level III facilities often lack the space to provide therapeutic services, and although some intermittent skilled nursing care and rehabilitative services are available at Level III facilities, under Massachusetts law, Level III facilities are primarily engaged in providing only maintenance or custodial care.  By definition, Massachusetts considers Level III care appropriate only for "patients whose condition is stabilized to the point that they need only supportive nursing care, supervision and observation." Mass. Regs. Code tit. 105, § 151.020.

16.     Level III facilities generally do not qualify for Medicare SNF certification, although they often qualify for Medicaid NF certification.  While the nursing home reforms mandated by the Omnibus Budget Reconciliation Act of 1987 ("OBRA 87") eliminated some of the differences between Medicaid NFs and Medicare SNFs, OBRA 87 maintained key differences between the two types of providers, including the definition of what type of care each had to be "primarily engaged in providing."  One of the most important characteristics left unchanged by OBRA 87 was that long term "intermediate" or custodial care remains reimbursable at Medicaid NFs, but not at Medicare SNFs.

17.     Under Massachusetts law, an institution may obtain a license to operate a new long term care facility only after the Department of Public Health ("DPH") issues a "determination of need" authorizing the creation of the facility.  Mass. Gen. Laws c. 111, § 71.

18.     By the early 1990s, DPH recognized that the demand for Level II beds exceeded the supply, whereas the demand for the predominantly supportive or custodial care provided by Level III nursing facilities was diminishing.  DPH responded to this continuing shift in demand for additional skilled nursing care by implementing a policy pursuant to which Level III facilities could obtain waivers of some of the new OBRA 87 requirements in order to admit Level II patients and become certified under the Medicare Program ("waiver and attestation procedure").  However, even after DPH instituted the waiver and attestation procedure, patient demand for more clinically sophisticated Level II beds continued to outstrip available capacity.  Because a relatively large number of Level III facilities in Massachusetts continued to have nonconforming physical plants, they did not and could not qualify for participation in the Medicare Program, and thus they were not able to admit Level II patients or to provide Level II care.

19.    In 1994, DPH made a further attempt to increase the number of facilities capable of providing Level II skilled nursing care, while at the same time continuing to reduce the a surfeit of older, long term custodial care Level III facilities.  DPH announced a moratorium on the grant of new determinations of need for the establishment of new long term care facilities, but at the same time DPH applied certain of its regulations to create an exception to the moratorium, as a means to increase the number of facilities providing Level II skilled nursing services.  Under the moratorium exception, DPH permitted hospitals to open new Level II skilled nursing facilities on the condition that the hospitals first acquire the operating rights of an existing Level III nursing home, and then arrange for the Level III home to close.  This exception to the moratorium came to be known as the "transfer of operating rights" procedure, and enabled DPH to continue to manage the shift in demand for skilled nursing (and rehabilitative) care from Level III to Level II facilities, by simultaneously facilitating the development of more Level II skilled nursing services and giving Level III providers a graceful way to exit the industry.

20.    Under the transfer of operating rights procedure, a hospital like Carney, seeking to create a hospital-based Level II SNF, would "acquire" an existing Level III nursing facility's "licensed beds", and then "transfer the site" of those beds to its own campus – usually simultaneously with or just after the existing Level III facility discharged its last patient and closed.  Thereafter, the hospital would open a new Level II skilled nursing facility with a new Level II license.  If it complied with DPH's "transfer of site" regulation, the hospital would be deemed to have been granted a determination of need to create the new hospital-based SNF.  The hospital was not required to utilize the Level III facility's operating rights or "licensed beds," and the Level III facility's actual beds were not required to be moved or sold.  The hospital surrendered or terminated the Level III operating rights when it

obtained a new license for its Level II SNF. Mass. Regs. Code tit. 105, §§ 100.250, 100.720, and 153.022.

21.    One requirement of DPH's "transfer of site" regulation was that the new site had to be located in the same health service area ("HSA")[2] as the original Level III facility. DPH did not, however, require that the two facilities be located near each other or even in the same city or town, that patients admitted to the new Level II skilled nursing facility reside in the same cities or towns as the residents of the Level III nursing facility, or that residents of the existing Level III qualify for admission at the Level II facility. On the other hand, since under Massachusetts law patient or nursing home resident medical records must be maintained for thirty years, in order for the Level III nursing facility to close, some arrangement had to be made with the hospital to become the records' custodian.

### The Establishment of Carney TCU (Skilled Nursing Facility)

22.    In the summer of 1994, Carney Hospital, an acute care community hospital located in an inner city Boston neighborhood, decided to establish a transitional care unit -- a hospital-based skilled nursing facility -- in order to provide a "continuum of care" for its patients. At that time, Carney Hospital's inpatient facilities were dedicated exclusively to the treatment of acute care patients. Carney Hospital did not, as of the summer of 1994, operate a skilled nursing facility, nor had it operated that type of health care facility at any time.

23.    In determining whether to proceed with the creation of a new hospital-based skilled nursing facility, Carney Hospital concluded that the new provider would be able to obtain an exemption under 42 C.F.R. § 413.30(e) because the Hospital had not previously operated a skilled nursing facility, and because CMS had granted new provider exemptions to

---

[2]  Health service areas are holdovers from an earlier health care planning era (the 1970's). DPH and many of its sister agencies in other states have abandoned HSAs in favor of more carefully honed demographic tools.

virtually all of the Massachusetts hospitals that established new hospital-based SNFs between 1991 and 1993.

24.    Carney Hospital was aware, as of the summer of 1994, that the only regulatory vehicle available to it for creating a hospital-based skilled nursing facility was the transfer of operating rights procedure.  In August 1994, Carney Hospital entered into an Asset Purchase Agreement ("APA") to acquire the operating rights held by Franklin Nursing Home, a 27-bed Level III nursing facility located in Braintree, a Boston suburb ("FNH").  Prior to August 1994, Carney Hospital and FNH, which were located miles apart in two very different communities, had no previous contractual or business relationship.

25.    FNH, whose residents were all female and mostly elderly, occupied a wood-frame building.  It did not have a DPH waiver to admit Level II patients, and it was never Medicare-certified.  Many of FNH's residents had been institutionalized at now-closed state mental institutions, and most had lived in one or another long-term custodial care facility for many years.  Because of deficiencies in FNH's physical plant (e.g., the lack of a sprinkler system or elevator, and over-crowded under-sized resident bedrooms), it could not have obtained a DPH waiver, nor ever been Medicare-certified.  FNH was one of many Level III "intermediate" Medicaid-certified nursing facilities grandfathered under OBRA 87.

26.    On August 19, 1994, Carney Hospital agreed to purchase certain enumerated assets from FNH's operator, Comeau Health Care, Inc. ("Comeau") for $275,000.  The specific assets which Carney Hospital purchased included FNH's name and goodwill, all "transferable licenses, permits or other rights and interests . . . relating to the ownership, management or operation of [FNH]," "certain . . . contracts, contract rights, agreements and commitments," and "all [of the operator's] books and records".  Carney did not agree to purchase any of FNH's tangible assets or any of the latter's liabilities, such as FNH's or

-10-

Comeau's real estate, fixtures, equipment, or accounts receivable. APA, Art. II, § 2.1.1-6. The APA provision for Comeau's sale of "all [its] *transferable* licenses, permits and other rights" (emphasis added) is the provision which encompasses FNH's operating rights. Under Massachusetts law, health care facility licenses -- of any type -- cannot be sold or transferred, but operating rights may be if DPH approves. The APA also provided that one of the "contracts" to be transferred to Carney Hospital was FNH's Medicaid Provider Agreement, in order to cover the possibility that by the early December closing date, FNH might not yet have been able to transfer or discharge all of its residents. Carney Hospital entered into a short-term lease with Comeau for the building which housed FNH and a short-term management agreement with Comeau to continue its operation of FNH until all of the residents were discharged or transferred to cover that same possibility. Both agreements expired by their own terms within two weeks after the closing date, when Comeau completed the discharge of all of the FNH residents.

27.    In the time between the date the APA was entered and the closing date, Carney Hospital took the steps necessary to satisfy DPH's transfer of operating rights procedure, including obtaining DPH's approval that the operation of FNH's beds could be discontinued for the purposes of relocating the residents, and then closing FNH. All of FNH's residents remaining as of the December 2 closing date were discharged or transferred as of December 16, 1994. On that date, FNH ceased operating.

28.    Carney Hospital did not begin to establish its hospital-based SNF until June, 1995, when it obtained DPH approval to construct a 27-bed SNF unit at the hospital. Carney Hospital opened its Transitional Care Unit (Carney TCU) on October 5, 1995 as a "distinct part" of the Hospital. None of the FNH's beds, equipment, or furniture was moved to or used at Carney TCU. Nor were any of FNH's employees hired by Carney TCU, or any of FNH's

residents transferred to Carney TCU. Carney TCU never acquired or used FNH's Level III

license. DPH issued a new Level II license to Carney TCU on October 6, 1995, which

enabled it to operate as a hospital-based SNF, and on October 26, *1995,* CMS certified

Carney TCU to participate in and receive reimbursement from the Medicare Program.

### Carney TCU's Request for a New Provider Exemption

29.    On February 1, 1996, in order to obtain reimbursement for the costs incurred

in creating Carney TCU as contemplated by the Medicare Program, Carney Hospital

submitted to its fiscal intermediary a request for a new provider exemption from the routine

cost limits for skilled nursing facilities. The request set forth the history of Carney Hospital's

new facility and explained that Carney Hospital had not previously operated a skilled nursing

facility. The intermediary forwarded the request to CMS pursuant to 42 C.F.R. § 413.30(e).

30.    In a letter dated May 8, 1996, CMS denied Carney Hospital's request for a

new provider exemption without ever looking at or considering what "type of provider" Carney

TCU was or how it operated. CMS stated that "[t]he key to understanding [CMS's]

regulations and policy concerning new provider exemptions is recognizing that we look at

the operation of the institution . . . under both 'past and present ownership' ... to determine if

and when skilled nursing and/or rehabilitative services were performed." CMS went on to

state that Carney TCU was "previously Franklin Nursing Home" and "was established due to

a relocation of an existing long term care institution . . . in accordance with the transfer of

site approved by the Massachusetts Department of Health (sic), Division of Health Care

Quality based upon a transfer of ownership of Franklin Nursing Home to Carney Hospital,

assuming relocation of the long term care facility to the campus of Carney Hospital."

(emphasis in the original). Based on this recitation of the facts, CMS concluded that Carney

-12-

TCU was not a new provider under 42 C.F.R. § 413.30(e). The fiscal intermediary

forwarded CMS's letter to Carney Hospital on May 21, 1996.

31.    CMS determined that the relocation provisions in § 2604.1 of the Manual did

not apply to Carney TCU based on its (CMS') comparison of address information imputed to

a group of FNH's residents (not its total population during the time period reviewed) and

actual address information for the patients admitted to Carney TCU during its first five

months of operations. However, the information on which CMS purportedly relied actually

belies its conclusions. The FNH resident/Carney TCU patient information (which is in the

administrative record) demonstrates a number of salient facts that CMS (and the Board

majority; *see infra*) disregarded: (1) Carney TCU's occupancy during the first five months of

its operations was approximately 36%, whereas FNH's occupancy for the comparable period

-- the last five months of its operations -- was approximately 100%; (2) the 12 FNH residents

whom CMS looked at (out of FNH's 25 actual residents) had lived at the home for a total of

28,922 days or more than 79 years, had an average length of stay of 2,416 days or 6.6 years,

and during the last five months of FNH's operations generated a total of 1,724 "patient days"

(reflecting an occupancy level of 94% based on total available "patient days"); and (3) the

110 Carney TCU patients that CMS considered generated a total of 1,472 patient days

(versus total available inpatient days for that five month period of 4,104), whereas FNH's

entire population during the last five months of its operations generated a total 3,170 "patient

days." CMS also failed to consider the size or population of HSA IV (metropolitan Boston

along plus a number of communities west and south of the city), and it ignored the differences

in acuity of Carney TCU's patients as compared to FNH's residents.

32.    CMS's denial of Carney TCU's new provider exemption had the effect of reducing Carney TCU's Medicare reimbursement by approximately $3,000,000 across the three applicable fiscal years: 1996, 1997, and 1998.

### Administrative Proceedings

33.    On July 25, 1996, within 180 days after receiving CMS's decision, Carney Hospital appealed CMS's denial of a new provider exemption for Carney TCU by filing a request for hearing with the Board. The appeal letter refers to 42 C.F.R. § 413.30(e) and indicates that the exemption at issue would have covered three of Carney TCU's fiscal years, beginning with 1996.

34.    The Board held an evidentiary hearing on Carney Hospital's appeal on February 7 and 8, 2002. At the hearing, Carney TCU presented evidence showing that: (1) the only item of any substance that Carney Hospital acquired from FNH was FNH's "licensed beds" or operating rights, so that FNH was not the "previous owner" of Carney TCU; (2) even if (contrary to Massachusetts law) FNH were deemed the previous owner of Carney TCU, FNH was never certified as a Medicare skilled nursing facility and was also never "primarily engaged in providing skilled nursing care and related services . . . or rehabilitative care", so that FNH never "operated" as the "equivalent" of a Medicare SNF in the three years prior to the establishment of Carney Hospital's skilled nursing facility; and (3) even if FNH were deemed the previous owner of Carney TCU and FNH had operated as the equivalent of a Medicare SNF, FNH's "normal inpatient" population, which consisted exclusively of custodial care patients who had resided at FNH or other institutions for years, could not expect to be served at Carney Hospital's hospital-based skilled nursing facility (which does not admit custodial care patients) within the meaning of § 2604.1 of the Manual.

35.    In a decision dated July 16, 2004 and received on July 19, 2004, a majority of the Board rejected Carney TCU's arguments and found that CMS had properly denied Carney TCU a new provider exemption.[3]  Specifically, the Board relied on CMS's interpretation of Massachusetts law rather than the explanation provided by Massachusetts regulators which is part of the administrative record.  The Board "agreed" with CMS "that a review of the transactions that occurred in this case coupled with a review of the assets actually purchased from Comeau, show that the Provider [Carney TCU] did, in fact, purchase and relocate Franklin." The Board majority also concluded that "a review of the evidence shows that Franklin operated as the equivalent of an SNF for more than 3 years immediately preceding its acquisition by the Provider."  In addition, the Board majority concluded that Carney TCU did not "qualify for new provider status based on Medicare's relocation rules." Although the Board majority appears to have accepted Carney TCU's evidence that a "different inpatient population is being served at its TCU than was served at Franklin's location," the Board majority disregarded unrebutted evidence showing that the total number of inpatient days at Carney TCU were substantially less than those at FNH during a comparable period.

36.    The dissent by Board Chairman Cochran focuses on her disagreement with "the Board majority's decision that Franklin had previously operated as an equivalent to a skilled nursing facility." Noting that FNH was certified under Medicaid but never under Medicare, Chairman Cochran contrasted the definition of a Medicare SNF contained in 42 U.S.C. § 1395i-3(a)(1)(A)-(B) with the definition of a Medicaid NF contained in 42 U.S.C.

---

[3]  Several evidentiary disputes arose between CMS and Carney TCU during the post-hearing period, including (but not limited to) disputes about whether the Board would expand the administrative record by admitting additional exhibits proffered by CMS without the Board's prior approval. Although the parties briefed the issues in their disputes, the Board's decision does not refer to the disputes or indicate what rulings, if any, the Board may have made on these evidentiary issues.

§ 1396r(a)(1)(A)-(C). Chairman Cochran found that "[t]he evidence was overwhelming

that Franklin, a residential facility, was primarily engaged in providing the type of care

described in subsection (C) of the Medicaid statute." Subsection (C) states, in pertinent part,

> a nursing facility is an institution which is primarily engaged in providing -
>
> . . .
>
> (C) on a regular basis, health-related care and services to individuals who because
> of their mental or physical condition require services (above the level of room and
> board) which can be made available to them only through institutional facilities.

42 U.S.C. § 1396r(a)(l)(C).

37.    Chairman Cochran also observed that while it was "undisputed that Franklin

provided some skilled services," "[m]ost of the services identified by the Intermediary as

skilled were those typical of what are routinely rendered in a home setting by a parent for a

child, or by a spouse or child for an elderly patient (cough syrup for cough; observe for ankle

swelling; observe for behavior changes)." Chairman Cochran rejected the conclusion offered

by CMS' clinical witness that "because a licensed nurse was on Franklin's staff to perform the

service, the service became skilled." Instead, Chairman Cochran credited unrebutted

testimony by FNH's last medical director and a Massachusetts official who was responsible

for regularly inspecting FNH's operations, and found that,

> Franklin operated consistent with its state license in providing only "periodic
> .. . skilled nursing, restorative or other therapeutic services;" that Franklin's
> patients were long term residents who were "aging in place" needing
> primarily "maintenance" or "supportive care;" and that they were transferred
> to facilities which could offer intensive skilled nursing or rehabilitative care
> when acute episodes occurred.

38.    Chairman Cochran also rejected CMS' "argument that OBRA 87 eliminated

all differences between a Medicare `skilled nursing facility' and a Medicaid `nursing facility'

[because CMS' interpretation] is not borne out by the legislative history." Instead, she found

that OBRA 87 did not eliminate subsection (C) of the Medicaid statute, the "committee report specifically described the subsection (C) services as continuing to be eligible for Medicaid payment", and "[t]here is no parallel to the Medicaid subsection (C) in the Medicare statute defining a skilled nursing facility." Noting that CMS' statutory interpretation "ignore[s] the distinction [in the two statutes and thus] violate[s] fundamental statutory construction principles", she concluded that "Franklin was not 'primarily engaged' in providing skilled nursing services and was, therefore, not an equivalent to Carney's TCU."

39.    Following the issuance of the Board's decision, CMS sought review by its Administrator.  The Administrator did not, however, take any action on that request. Accordingly, the Board's decision constitutes the Secretary's final decision.

### Carney TCU's September 14, 2004 Complaint and Proceedings Thereon

40.    By Complaint dated September 14, 2004 filed in this Court, Carney TCU sought review of the Secretary's decision.  *Carney Hospital Transitional Care Unit v. Thompson*, Civ. No. 04-1598 (RCL) ("*Carney Hospital TCU v. Thompson*") [dkt. 1].  That review substantially implicated a case then pending in the United States Court of Appeals for the District of Columbia styled *St. Elizabeth's Medical Center of Boston, Inc.* v. *Thompson*, 395 F.3d 1228 (D.C. Cir. 2005).  Accordingly, on November 16, 2004, a Consent Motion to Stay Proceedings pending the D.C. Circuit's resolution of the *St. Elizabeth's* case was filed and, on November 17, 2004, allowed by this Court.  *Carney Hospital TCU v. Thompson* [dkts. 7, 8].

41.    By Decision dated February 4, 2005 as cited in paragraph 40 above, the United States Court of Appeals for the District of Columbia Circuit, deciding in favor of St. Elizabeth's, a medical center applicant for "new provider exemption", and against the

Secretary, established clear guidelines for the processing of such applications by the Secretary.

42.     By Order dated June 1, 2006, this Court Ordered the matter remanded to the Secretary for determination of Carney TCU's application on two specific bases: (a) by "application of the standard announced in St. Elizabeth's Medical Center of Boston, Inc. v. Thompson" upon (b) "the full administrative record that was before the Provider Reimbursement Review Board." *Carney Hospital TCU v. Thompson* [dkt. 21].

43.     On July 7, 2006, the Deputy Administrator for the Centers for Medicare & Medicaid Services ("CMS"), apparently under authority of the Secretary, delegated to CMS the obligation imposed upon the Secretary, by this Court's June 1, 2006 Order, to render a determination on whether Carney TCU is entitled to a new provider exemption by (a) applying the standard announced in *St. Elizabeth's Medical Center of Boston, Inc.* v. *Thompson* to (b) the full administrative record that was before the Provider Reimbursement Review Board.

44.     By letter dated November 2, 2006, CMS, purportedly acting under authority of the Secretary, rendered the determination which this Court had directed the Secretary to make. A copy of this determination is attached hereto marked Exhibit A.

45.     The determination of the Secretary set forth in the November 2, 2006 letter violates this Court's June 1, 2006 Order.

46.     First, the Secretary has ignored this Court's directive that his consideration be of "the full administrative record that was before the Provider Reimbursement Review Board." The November 2, 2006 determination relies extensively on information nowhere presented to the Provider Reimbursement Review Board ("PRRB") by CMS or Carney TCU, including but not limited to information from "professional nurses" apparently consulted by

-18-

CMS after remand of this matter, a process of evaluating "skilled nursing services" apparently conducted after the remand, and other documentary information nowhere contained in the subject "administrative record." The Secretary therefore did not make the determination for which this Court remanded the matter. Instead, he remanded the matter to CMS, who then issued a new determination unconstrained by the evidence contained in the record before the PRRB. The decision thus purports to become a new factual determination as to the provider's entitlement to a new provider exemption rather than, as directed, a Secretary's review of the PRRB determination upon the full administrative record before the PRRB but in light of a new judicial standard. Therefore, the November 2, 2006 determination is in direct violation of this Court's June 1, 2006 Order and invalid.

47.    The Secretary's determination also violates the Court's June 1, 2006 Order because it misconstrues and misapplies the standard set forth in *St. Elizabeth's*. In *St. Elizabeth's*, the Court made clear that a nursing facility cannot be considered the equivalent of a skilled nursing facility unless it was "primarily engaged" in providing skilled nursing and rehabilitation services. The Court also clarified that the occasional provision of a limited range of skilled services does not render a facility "primarily engaged" in providing skilled services. The Secretary erred in applying that standard here. The Secretary determined that the Carney TCU was "primarily engaged" in providing skilled nursing and/or rehabilitation services because "in calendar year ending 1992 on average 73% of the patients at Franklin Nursing Home required <u>some</u> skilled nursing and related services or rehabilitative services; in the calendar year ended 1993 that percentage was 75%; and in the calendar year ending 1994 that percentage was 84%." (emphasis added) This conclusion is unsupported by the administrative record, which contains no evidence that any FNH client received skilled services on a daily basis for even a period of a week (apart from an isolated instance

in a 1800 day stay of a post-surgical recovery). Moreover, these figures do not suggest, as required by *St. Elizabeth's*, the overall frequency and regularity with which FNH provided skilled nursing services. Under the Secretary's construction, the isolated provision of even a limited range of "skilled services" to some of the FNH clients, many of whom the record demonstrated lived for "eight, ten or twelve" years without any skilled services would qualify FNH as "primarily engaged" in providing skilled nursing services. Such conclusion misconstrues and, therefore, misapplies the Court's articulation of the standard in *St. Elizabeth's*.

48.    This Court therefore should review the matter without reference to the Secretary's improper and unlawful attempt to supplement the administrative record before the PRRB rather than review it and to ignore the plain requirements of the *St. Elizabeth's* decision.

49.    The undisputed evidence before the PRRB established that Carney's transferring institution, FNH, was not "primarily" engaged in providing skilled nursing and/or rehabilitative services and was "primarily" engaged in providing the type of custodial care described in Subsection (C) of the Medicaid statute. The undisputed evidence showed that FNH's provision of "periodic . . . skilled nursing, restorative or other therapeutic services" did not meet the *St. Elizabeth's* standard for a skilled nursing facility. Therefore, Carney is entitled to a "new provider" exemption, and to the enhanced reimbursement it has sought through the many years of this process.

## COUNT I

50.    Carney TCU repeats and reasserts the allegations in paragraphs 1 through 49 as if fully set forth herein.

51.    When it opened in October 1995, Carney Hospital's hospital-based skilled nursing facility was entirely new. It had no connection to FNH or to any other pre-existing nursing facility, except to the limited extent that Massachusetts state law and policy required Carney Hospital to arrange for FNH to cease to operate and to surrender its license. Further, FNH never operated as the "equivalent" of a skilled nursing facility because FNH was primarily engaged in providing custodial care and was never primarily engaged in providing skilled nursing care or rehabilitative services. Finally, because of their limited clinical needs and ties to South Shore communities, FNH's residents could not expect to be served at Carney Hospital's skilled nursing facility. Under these circumstances, Carney TCU was a "new provider," as that term is defined in 42 C.F.R. § 413.30(e). Accordingly, the Board's failure to find that Carney TCU was entitled to a new provider exemption was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and unsupported by substantial evidence.

## PRAYER FOR RELIEF

WHEREFORE, Carney TCU respectfully requests that the Court:

1.    Reverse the Secretary's and Board's decisions;

2.    Declare that Carney TCU is entitled to a new provider exemption for its cost reporting periods ending September 30, 1996, September 30, 1997, and September 30, 1998;

3.    Award Carney TCU prejudgment interest on the amounts due pursuant to 42 U.S.C. § 1395oo(f)(2);

4.    Award Carney TCU its attorney's fees and costs; and

5.    Award Carney TCU such other relief as the Court deems just and proper.

CARNEY HOSPITAL
TRANSITIONAL CARE UNIT

Respectfully submitted,

Thomas B. Smith
D.C. Bar No. 412192
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW
Washington, DC  20005-3948
Tel:  202-508-4600
Fax:  202-508-4650

John C. Kane, Jr.
Jeffrey L. Heidt
ROPES & GRAY LLP
One International Place
Boston, MA  02110-2624
Tel:  617-951-7000
Fax:  617-951-7050

Dated:  December 28, 2006

7238700_1

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

**I (a) PLAINTIFFS**

Carney Hospital Transitional Care Unit
2100 Dorchester Avenue
Boston, MA 02124-5666

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**   88888
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**

Michael O. Leavitt, in his official Capacity
Secretary of the U.S. Dept. of Health & Human
Services, 200 Ind.Ave., NW, Wash. DC 20001

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**   11001
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Thomas B. Smith
Ropes & Gray, LLP
700 12th Street, NW, Suite 900
Washington, DC 20005

**ATTORNEYS (IF KNOWN)**

Attorney General of the United States
950 Pennsylvania Avenue, SW
Washington, DC 20530-0001

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
   Plaintiff

○ 3 Federal Question
   (U.S. Government Not a Party)

⊗ 2 U.S. Government
   Defendant

○ 4 Diversity
   (Indicate Citizenship of
   Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☒ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**     **OR**     ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊗ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Court from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. § 139500(f). Review of Medicare reimbursement determination.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complain<br>JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE    12-28-06    SIGNATURE OF ATTORNEY OF RECORD    *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-06-27
Baltimore, Maryland 21244-1850



**Center for Medicare Management**

Refer to: FAHB4

0 2 NOV 2006

Mr. Vinnie Guarino
Director
Medicare Audit and Reimbursement
Associated Hospital Service
50 Salem Street
Lynnfield, Massachusetts 01940-2694

  Re: Medicare New Provider Exemption Request for
     Carney Hospital Transitional Care Unit

Dear Mr. Guarino:

By order dated June 1, 2006, the United States District Court for the District of Columbia, in the case of Carney Hospital Transitional Care Unit v. Thompson, remanded the case to the U.S. Department of Health and Human Services to consider the provider's application for an exemption to the Medicare skilled nursing facility ("SNF") routine service cost limits utilizing the standard set in St. Elizabeth's Medical Center of Boston v. Thompson, 396 F. 3d 1228 (D.C. Cir. 2005). Carney Hospital Transitional Care Unit, Provider Number 22-5731, is seeking an exemption as a new provider under the regulations at 42 CFR 413.30(e)(2) for the cost reporting period ended September 30, 1996.

The standard set forth in St. Elizabeth's Medical Center of Boston v. Thompson requires the Secretary to determine, in evaluating whether a provider is entitled to an exemption from the Medicare routine service cost limits as a new provider, after acquiring assets from an existing facility, whether or not the facility from which the assets were acquired meets the definition of a SNF for purposes of certification set forth in 1819(a)(1) of the Act. This definition states

2

> "**Skilled Nursing Facility Defined**. In this title, the term "skilled nursing facility" means an institution (or a distinct part of an institution) which – (1) is primarily engaged in providing to residents (A) skilled nursing care and related services for residents who require medical or nursing care, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick person."

Being "primarily engaged" in furnishing skilled nursing care under the basic SNF definition in 1819(a)(1) refers to the type of care that a facility, or distinct part of a facility, provides to its patients generally rather than the type of care a particular patient may receive at a given point in time. The definition relates to the overall character of the institution, or distinct part of the institution, rather than the type of care that an individual patient receives.

Nursing facilities ("NFs") provide care to a very heterogeneous resident population. Some individuals require short-term, intense rehabilitation services; others, on the other hand, may be incontinent, mentally impaired, or so seriously disabled that they require extensive and continuous care for months or years. Providing consistently high quality of care in nursing homes to a varied group of frail, very old residents, many of whom have mental impairments as well as physical disabilities, requires that functional, medical, social, and psychological needs of residents be individually determined and met by careful assessment and care planning – steps that require professional skill and judgment. Improving the Quality of Care in Nursing Homes, Institute of Medicine, pgs. 8, 10 (1986). For these reasons, skilled nursing care is required by many persons who suffer from chronic diseases necessitating the kinds of treatment and care that require frequent or continuous observation and/or specialized services that can safely be performed for them only by, or under the supervision of, professional or licensed practical nurses.

The critical factor in distinguishing skilled from unskilled or supportive care is the need for the services of licensed health personnel. Skilled nursing care and rehabilitation services are furnished directly by, or under the supervision of, [1] technical or professional personnel such as registered nurses, licensed practical nurses, physical therapists, occupational therapists, speech pathologists or audiologists, working under the direction of a physician. 42 CFR 409.31(a). For example, physicians need to know from nursing staff a patient's response to treatments (e.g., drugs) in order to determine whether drugs should be adjusted in dosage or the regimen altered.

---

1 "Under the supervision of technical or professional personnel" means that an aide may perform skilled services under the general supervision of technical or professional personnel who is on the premises of the institution at the time the service is performed.

3

In the case of Carney Hospital Transitional Care Unit, Carney Hospital assumed ownership and operation of the Franklin Nursing Home, a certified NF, including assignment of the facility's Medicaid provider agreement on December 3, 1994. Carney Hospital then operated the Franklin Nursing Home at its location in 149 Franklin Street, Boston, MA, through Friday, December 16, 1994 at which time all remaining residents were transferred to other facilities. The facility's license was subsequently suspended and the facility was relocated to the hospital campus and renamed the Carney Hospital Transitional Care Unit. The Carney Hospital Transitional Care Unit re-opened on October 5, 1995, and was certified to participate in the Medicare program on October 26, 1995 as a certified skilled nursing facility.

Franklin Nursing Home had been certified to participate in the Medicaid program as a nursing facility through April 4, 1995. Even though certified as a NF prior to its relocation in 1995, Franklin Nursing Home was required to furnish, and was eligible to be reimbursed under the Massachusetts Medicaid program for furnishing, skilled nursing and related services and rehabilitation services to many of the same groups of individuals for which Carney Transitional Care Unit was later entitled to reimbursement under Medicare.

Carney Hospital has submitted a document entitled "Franklin Nursing Home Residents 1991-1994." This document details its review of medical records from the Franklin Nursing Home which it had in its possession. The document purports to "give some context to" the Management Minutes Questionnaire Turnaround Documents detailing the services for which Franklin Nursing Home was reimbursed by the Medicaid program, herein referred to as the "Resident Summary."

The information in the Resident Summary was reviewed by professional nurses at both the Intermediary and CMS who themselves also reviewed the medical records (either in part or in full). The professional nursing staff from both the Intermediary and CMS disagrees with the description of the services received by the residents at Franklin Nursing Home and portrayed by Carney Hospital in the Resident Summary as unskilled services. According to the professional nurses, the medical records contained evidence of medical procedures/consultations and clinical assessments and judgments that can only be performed by or under the supervision of a licensed professional (e.g., physician, registered nurse, licensed practical nurse, occupational therapists, physical therapist, speech pathologist or audiologist). These are, by definition, skilled services. 42 CFR 409.33 (a)(b) and (c). In addition, CMS found that the Franklin Nursing Home had reported and been reimbursed for providing skilled nursing and related services based upon the Management Minutes Questionnaire Turnaround Documents, Form LTC-001 ("MMQ") filed with the State of Massachusetts, Medicaid State Agency. A summary of skilled nursing and related services and rehabilitative services provided by the Franklin Nursing Home, as found in the record, are listed below:

- Psychiatric consults/evaluations and reevaluation.

4

- Monitoring residents behavior due to risk of violence.
- Assessing the effects and side effects of psychotropic medications.
- Skilled observation, examples of which can be found in the medical records as follows: limp and pain with physician order to send resident to the hospital outpatient department based upon clinical judgment; signs and symptoms of clinical depression; anorexia; isolation; weight loss; shortness of breath; pedal edema; ankle edema; congestion; dyspnia; cyanosis; malaise; aspiration precaution; increased sedation; nausea or vomiting; level of consciousness; circulatory and respiratory status; and circumoral cyanosis – with follow-up to physician as required.
- Restorative nursing program for diabetic teaching, range of motion (ROM), ambulation, gait training, activities of daily living (ADL's) and feeding.
- Intra-muscular injections of Vitamin B-12, Haladol, Prolixin, flu vaccine and Glucagon.
- Medications, wet to dry, sterile dressings to wounds, using aseptic techniques.
- Specialized Geriatric Services consult and treatment.
- Insertion, removal and irrigation of foley catheters. Use of 3 way foley catheter, changing of irrigant tubing as ordered.
- Physical assessment and neurological evaluation following incidents (i.e., resident found on floor).
- Dental consultation.
- Bleeding precautions.
- Physical therapy evaluation and treatment.
- Assessment for pre-disposition for falling.
- Duoderm/Epilock treatment to Stage II decubitus ulcer and open areas until healed.
- Treatment of stage 1, stage II, stage III and stage IV decubitus ulcers.
- Developing behavior management programs using clinical judgment.
- Pain evaluation and management with follow-up to physician as necessary.
- Assessment of - fresh surgical wounds for signs and symptoms of healing and infection; chest congestion; signs and symptoms of infection; symptoms of panic attack and cardiac problems; neurological assessment; signs and symptoms of urinary tract infection; symptoms of abdominal tenderness or discomfort; symptoms of hypo-hyper-glycemia; peripheral pulses; blood pressure and apical pulse; and report to physician as required.
- Culture drainage of bodily fluids.
- Betadine swab and Thymol Iodide treatment.
- Use of Holter monitor to assess cardiac condition.
- Digital check of rectum.
- Diabetic foot care.
- Institute bladder training program and monitor input/output.
- Superficial heat treatment.
- Psycho-pharmaceutical evaluation.
- Orthopedic evaluation.

**Exhibit A**

- Oxygen therapy.
- Suctioning.
- Medication administration with parameters requiring clinical judgment.
- Observation, assessment and treatment of widespread rash.
- Institute infection control precautions.
- Hospice consultation.
- Mantoux test.
- Straight catheterization as needed.
- Endocrine consult.
- Speech evaluation and treatment.
- Occupational therapy consultation and treatment.
- Orthotic evaluation of leg brace.
- Oncology consult.
- Podiatry consult.
- Observe and assess patency of Jackson-Pratt drain.
- G.I. consult.
- Sigmoidoscopy and barium enema.
- Asses for risk of pressure ulcers using Braden Risk Assessment.
- Daily subcutaneous injections.
- Initial history and physical assessment.
- Surgical consultation.

To determine if the Franklin Nursing Home was "primarily engaged" in the provision of skilled nursing and related services or rehabilitative services, CMS considered the regularity with which Franklin Nursing Home provided such services.  CMS looked to the types of services that were recorded on the MMQ and the services that were reflected in the medical record excerpts, and CMS compared that information to the resident census and to the admission/discharge information contained in Medicaid cost reports for Franklin Nursing Home and the Resident Summary that was submitted by the provider.  CMS performed this review and comparison for each of the calendar years relevant to the request for a new provider exemption.

CMS found that in the calendar year ending 1992 on average 73% percent of the patients at Franklin Nursing Home required skilled nursing and related services or rehabilitative services; in the calendar year ending 1993 that percentage was 75%; and in the calendar year ending 1994 that percentage was 84%.

In Milton Hospital Transitional Care Unit v. Thompson, a case which came after St. Elizabeth's, the court found it important to determine whether skilled services "were provided to less than half of the residents." 377 F. Supp. 2d 17, 27-28 (D.D.C. 2005) (citing cases).  The court found that such a determination was necessary in evaluating whether a facility was "primarily engaged"

in operating as a SNF. For each of the calendar years that we examined, Franklin Nursing Home was providing skilled nursing and related services or rehabilitative services to well over half its patient population. Thus, examining the factors the court found relevant in <u>Milton</u>, we find the data demonstrates that Franklin Nursing Home was "primarily engaged in" providing skilled nursing services and related services or rehabilitative services.

We also note that Carney Hospital Transitional Care Unit also requested that CMS review their request under the relocation provisions found in Section 2533.1B.3 of the Provider Reimbursement Manual, Part I ("PRM"). To be eligible for an exemption based on the relocation provisions in PRM § 2533.1B.3, an institution or institutional complex must demonstrate that in its new location a substantially different inpatient population is being served. The normal inpatient population is defined as the health service area ("HSA") for long term care facilities, or its equivalent, as designated by the State planning agency or local planning authority in which the institution or institutional complex is located. If an institution or institutional complex relocates within the same HSA for long term care facilities, or its equivalent, it will not qualify for a new provider exemption, as the population normally served would continue to be expected to be served, unless 50 percent or more of its admissions (all payers) are from a different HSA. Furthermore, the institution or institutional complex must show that the total number of inpatient days for all payers in the new location was substantially less than at the old location for a comparable period during the year prior to relocation.

CMS's review of the first year of home addresses of the admissions to the Carney Hospital Transitional Care Unit demonstrated that the Carney Hospital Transitional Care Unit served residents from Boston, Quincy, Weymouth, Dorchester, Braintree, Jamaica Plain, Mattapan, Milton, Scituate, Randolph, and Cohasset – all of which lie within HSA IV, the service area identified by the State of Massachusetts, more commonly known as Greater Boston. Patients from this service area constituted 92.4% of all admission to the Carney Hospital Transitional Care Unit in its first year of operation. These same cities and towns were served by Franklin Nursing Home, as attested to by the Hospital in its application for a change in location of the Franklin Nursing Home. Thus, CMS finds that there has been no substantial change in the population served, or in the primary service area.

This is the final decision of the CMS. If Carney Hospital Transitional Care Unit is dissatisfied with this decision, as provided at 42 CFR 413.30(c), it may seek review of this decision by filing a request for hearing with the Provider Reimbursement Review Board within 180 days of the date of this decision. We refer the parties to Medicare regulations, 42 CFR Part 405 Subpart R for further information about the Board's authority and proceedings before it.

7

If you have any questions regarding this letter please contact Julie Stankivic of my staff at (410) 786-5725.

Sincerely,

Laurence D. Wilson
Director
Chronic Care Policy Group
Center for Medicare Management

cc: Tom Smith, Ropes & Gray, Counsel for Provider

**Exhibit A**
**-7-**